Filed 12/10/14  P. v. Singh CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C068021 |
| Plaintiff and Respondent, | (Super. Ct. No. SF113711A) |
| v. | |
| BALJIT SINGH, | |
| Defendant and Appellant. | |

Defendant Baljit Singh appeals from his conviction of second degree murder of his wife and the finding he was sane at the time he committed the murder.  He alleges the following errors:

1.      Substantial evidence does not support the jury's determination of sanity;

2.      The trial court abused its discretion when it denied his five *Marsden* motions;[1]

---

[1]      *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

3. The court abused its discretion by admitting photographs of defendant's children wearing bloody clothing and of the victim's autopsy;

4. The court abused its discretion by refusing to continue sentencing to allow defendant's new attorney time to prepare a motion for new trial;

5. The court denied defendant his right to testify in his own behalf;

6. The court erred by not instructing on voluntary manslaughter and involuntary manslaughter as lesser included offenses; and

7. Cumulative error.

We disagree with defendant's contentions and affirm the judgment.

FACTS

*Guilt phase*

The information charged defendant with murder (Pen. Code, § 187, subd. (a))[2], and alleged he used a knife to commit the murder (former § 12022, subd. (b)(1)).

Defendant started working at the San Jose airport's weather station in 2004. Initially, he worked five days a week, eight hours a day. In 2008, he began working four days a week, 10 hours a day. In October 2009, he reduced his weekly hours to 37. In November 2009, he reduced his hours to 30 hours, spread over three 10-hour shifts. Defendant's supervisor, Thomas Chance, said defendant was "the picture of stability" and "an ideal employee."

On December 11, 2009, defendant asked Chance for the company doctor because his back was hurting him. His back would stiffen on the long drive from his home in Lathrop to work. Chance told defendant there was no company doctor, but the company's insurance would cover him. Chance also told him if his back was bad, he should see a doctor.

---

[2] Further undesignated section references are to the Penal Code.

2

On December 14, 2009, defendant called in sick for work. Later that day, Chance called defendant and gave him the company's insurance policy number. Defendant, however, did not want the insurance information; he wanted the company doctor. Defendant insisted on the company doctor, even though Chance told him there was not one.

On his next shift, December 16, defendant asked Chance if he got the company doctor for him. Chance again told him to use the company insurance and go see a doctor. Defendant took the insurance information. But on his next shift, December 18, he asked the same question, and Chance repeated his answer.

On the day of his next shift, December 21, defendant called Chance and said he quit. When asked why, defendant said he was not feeling well. He returned his security badge the following day, December 22. Defendant was reluctant to use his badge or key to access the facility because he was no longer an employee, so Chance let him in to the premises. Chance believed defendant wanted "to be precise," as in everything he did. Defendant looked clean and well maintained at that time.

That same month, defendant and his wife, Sherene, had dinner with his uncle, Niranjan Uppal, and Uppal's fiancée, Marie Saenz. Defendant's and Sherene's behavior seemed different. Defendant mumbled to himself and fidgeted with his fingers. Sherene seemed sad and acted afraid. Defendant spoke with Uppal in the garage and asked him how to apply for unemployment and, if he got injured on his property, whether his homeowner's insurance would cover it. During that time, Sherene and Saenz had been talking at the table. When the men came in from the garage, Sherene turned away from Saenz as if she had not been talking with her. She went to the kitchen sink and acted like she was doing something there.

On December 23, 2009, at around 12:49 a.m., San Joaquin County Sheriff's deputies were dispatched to defendant's home. Defendant's eight-year-old son opened the door to them. He had a blank stare and was covered in blood. He let the deputies in,

3

and defendant's 10-year-old daughter told them her parents were upstairs. The deputies noticed blood stains on the stairs.

When a deputy announced themselves, defendant jumped out of a bedroom, holding a knife in his right hand. He was completely saturated in blood. With their weapons drawn, the deputies ordered defendant a number of times to drop the knife. Defendant did not. Several times, he said, "Just shoot me." He took a step towards one of the deputies, who fired his Taser and subdued defendant. He had a laceration on his neck. In a bedroom, deputies found the body of defendant's wife, Sherene. She was fully clothed, and her clothes were extensively soiled by blood.

The pathologist determined Sherene suffered three deep stab wounds in the front of her neck that extended from the neck's junction with the submental triangle down to its junction with the trunk. The stab wounds indicated the stabbings had not been simple stabs in and out, but were in and out with motion of the knife inside the body. Sherene also had nine incised wounds in and around her face, neck, and head. In addition, she had numerous abrasions and contusions on her lips and other body areas, as well as some defensive wounds. Because the stabbings cut her trachea and completely transected the jugular vein, she bled to death as well as drowned in her own blood. She was not dressed like someone who was going to bed. Her wounds were not consistent with having committed suicide, and she was not under the influence of any substance. The presence of blood stains on many different surfaces indicated there had been some type of struggle.

Defendant presented no evidence in the guilt phase.

The jury convicted defendant of second degree murder and found the knife enhancement true.

*Sanity phase*

The trial court appointed two mental health experts to opine on defendant's sanity at the time he murdered his wife. John Chellsen, Ph.D., a clinical psychologist, and Dr. Kent Rogerson, a psychiatrist, both believed defendant was insane when he killed his

4

wife. Both testified defendant was incapable of knowing and understanding the nature and quality of his actions and their wrongfulness when he committed the crime.

Dr. Chellsen opined defendant suffered from depression, and at the time of the murder, his depression had worsened to include psychotic symptoms such as hallucinations, disordered and delusional thinking, and a loss of contact with reality. Dr. Chellsen believed defendant's condition might more accurately be categorized as schizoaffective disorder, which includes major depression along with symptoms of schizophrenia. He claimed defendant's disorder had improved since the murder to the moderate range of severity.

Dr. Rogerson believed defendant had major depression with delusional and confused thinking. He testified defendant began suffering from a sinus infection, headaches, and back pain in October 2009. These aliments affected his ability to sleep, and he became progressively more depressed. Defendant began having suicidal thoughts, and he pulled away from doing things he normally did. Dr. Rogerson believed defendant was depressed, delusional, and had no understanding of what was going on at the time of the crime.

Both expert witnesses believed defendant was not malingering or faking his symptoms.

Detective Lawrence Gardiman testified for the prosecution. He visited defendant in the hospital the morning of the killing. He was told defendant was not taking any medication at that time. He read defendant his *Miranda*[3] rights and asked him if he understood his rights. Defendant said, "Yes." Detective Gardiman next asked defendant if he wanted to talk about what happened. Defendant said he would talk to Detective Gardiman the next day.

---

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

The following day, Detective Gardiman again met with defendant at the hospital. He advised defendant of his rights and asked if he understood them. Defendant said he did, and he wanted an attorney. The detective then left.

The prosecution presented no expert testimony on the sanity issue.

The jury determined defendant was sane at the time of the murder. The trial court sentenced defendant to a prison term of 15 years to life, plus one year, consecutive, for the weapon enhancement.

## DISCUSSION

## I

### *Sufficiency of the Evidence Supporting Finding of Sanity*

Defendant contends insufficient evidence supports the jury's finding he was sane at the time he committed the murder. He asserts the evidence, particularly the mental health experts' opinions, was uncontradicted and entirely to the effect that defendant was insane at the time of the crime. We disagree, and find sufficient evidence in the record to uphold the finding.

The defense of not guilty by reason of insanity "shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).)

"Because the burden was on the defense to show by a preponderance of the evidence that appellant was insane, before we can overturn the trier of fact's finding to the contrary, we must find as a matter of law that the [jury] could not reasonably reject the evidence of insanity. [Citations.] Neither the law nor the record before us compels such a result.

"While it is true that the expert witnesses . . . unanimously agreed that appellant was insane at the time of the incident, this is not determinative. ' "However impressive

6

this seeming unanimity of expert opinion may at first appear . . . our inquiry on this just as on other factual issues is necessarily limited at the appellate level to a determination whether there is substantial evidence in the record to support the [jury's] verdict of sanity . . . . [Citations.] It is only in the rare case when 'the evidence is uncontradicted and entirely to the effect that the accused is insane' [citation] that a unanimity of expert testimony could authorize upsetting a . . . finding to the contrary." [Citation.] Indeed [the Supreme Court has] frequently upheld on appeal verdicts which find a defendant to be sane in the face of contrary unanimous expert opinion. [Citations.]' [Citations.]" (*People v. Skinne*r (1986) 185 Cal.App.3d 1050, 1059-1060.)

Defendant contends his case is the rare case of uncontradicted evidence. It is not. The same jury sat for both the guilt and sanity phases, and there is sufficient evidence in the record of those proceedings to support the jury's disagreement with the expert witnesses.

Defendant's action immediately after the murder showed he knew what he had done was wrong. When police officers announced their presence in his home, defendant jumped out of a bedroom with a knife in his hand and repeatedly asked the officers to shoot him. His words demonstrated a consciousness of guilt, an understanding of the nature and quality of his actions and recognition they were wrong.

In the hospital on the day of the murder and the following day, defendant showed he was thinking and understanding rationally. When Detective Gardiman read defendant his *Miranda* rights hours after the murder, defendant said he understood them. When asked if he wanted to talk about the incident then, defendant stated he wanted to wait until the following day. On the next day, when Detective Gardiman again read defendant his *Miranda* rights, defendant again said he understood them. Moreover, he demonstrated he understood them by asking for an attorney instead of speaking with the detective. These were rational thoughts and actions taken within hours of the murder.

7

Evidence contradicted some of the expert witnesses' opinions. Dr. Chellsen testified defendant had no memory of the events that led up to the murder. However, in an earlier court proceeding, defendant testified under oath he and Sherene had begun a fight that escalated to a fight over a knife. Dr. Chellsen said defendant was not able to reconcile this discrepancy.

Dr. Chellsen said defendant reported experiencing hallucinations and hearing "whistling sounds" just before the murder. However, defendant's medical records from his hospital stay after the murder noted defendant denied experiencing any auditory or visual hallucinations.

Based on his testing with defendant, Dr. Chellsen stated defendant "may not volunteer potentially self-damaging information and may gloss over a few incidental details." Defendant's inability to respond in a factual manner led Dr. Chellsen to believe defendant's responses were "generally inaccurate." Dr. Chellsen did not "want to be hoisted on [his] own petard . . . and have to account for every word" in that assertion. But, as an example of defendant's inaccurate responses, Dr. Chellsen referenced defendant's expectation he would be released from custody and reunited with his children once the court proceedings ended.

Based again on his testing, Dr. Chellsen described defendant as being "only marginally capable" of taking care of his everyday needs. Yet Thomas Chance, defendant's employer, testified that on the day defendant returned his badge to work, hours before the murder, defendant was neat and well groomed. When Dr. Chellsen was asked if his opinion would be different if he was told defendant was clean, nicely dressed and well groomed just before the murder, he said that scenario would be inconsistent with his testing on defendant.

Dr. Rogerson's assertion that defendant had no memory of the murder was also contradicted. Defendant told Dr. Rogerson he remembered driving to San Jose, turning in his badge, returning home, having dinner and some beers, and going to bed at 7:00

p.m. Defendant said he did not remember anything from when he went to bed until he woke up in the hospital the next day. However, in earlier testimony, defendant claimed Sherene had come into the master bedroom holding a knife and was bleeding, slashed his throat, and that during the ensuing struggle, Sherene must have stabbed herself repeatedly. Dr. Rogerson had recently read that testimony, and he believed defendant's earlier testimony was a reconstruction trying to make sense of the periods of time he did not remember.

Dr. Rogerson testified defendant was not aware of what was going on before, during and after the murder, and that defendant had become psychotic "roughly on the 23rd of December." However, Dr. Rogerson admitted that much of defendant's activity on December 23 – driving to San Jose to turn in his badge, taking pain medication for his back, declining to take the family to a park, going to bed early – "could be reasonable" under the circumstances. And his having dinner and playing video games with his children before going to bed did not seem unusual.

Indeed, the jury reasonably could have concluded defendant's behavior leading up to the murder was rational, not delusional. Defendant had moved to Lathrop that summer. He may have reduced his shifts to avoid the long commute to San Jose. He visited his doctor to seek medication for back pain and headaches. He had difficulty falling asleep at night and was suffering from memory loss, perhaps because his work shifts did not end until midnight and he would sleep from 2:00 a.m. to 6:00 a.m. He had suffered a major depression episode 16 years earlier in Fiji and had been hospitalized, but he had had no psychiatric treatment since then. As Dr. Chellsen agreed, major depression, although serious, does not lead someone to commit murder. A person in a major depression episode is not necessarily insane.

The evidence of defendant's behavior immediately after the murder, the contradictions with the expert witnesses' testimony, and the evidence of defendant's rational behavior before the murder constitutes substantial evidence in support of the

9

jury's rejection of the expert opinions and its finding defendant was sane at the time he killed his wife.

## II

### *Denial of* Marsden *Motions*

Defendant contends the trial court deprived him his constitutional right to effective assistance of counsel when it denied his five separate *Marsden* motions for substitution of counsel. He asserted his relationship with counsel had deteriorated because, depending on the time of each motion, she had refused to show him the police report or bring a motion to dismiss, had not discussed the facts with him, had not worked to delay the trial until he was in a better state of mind, had failed to investigate alternate theories, had failed to object to certain jury instructions, and had not asked witnesses at trial certain questions. We have reviewed the record and conclude the trial court did not abuse its discretion when it denied defendant's *Marsden* motions.

"The governing legal principles are well settled. 'Under the Sixth Amendment right to assistance of counsel, " ' "[a] defendant is entitled to [substitute another appointed attorney] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' " [Citation.] Furthermore, " ' "When a defendant seeks to discharge appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance." ' " ' [Citations.] ' "[S]ubstitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel." [Citations.]' [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 95 (*Valdez*).)

10

The record demonstrates that with each *Marsden* motion he filed, defendant received an adequate hearing where he was able to explain his contentions. The record also demonstrates that with each motion, defendant failed to show how not replacing his attorney would substantially impair his right to assistance of counsel.

The first *Marsden* motion arose before trial. On this motion, defendant argued the merits of his defense and failed to show he was not being represented adequately. Speaking at times through an interpreter, defendant spoke about how he had never been in trouble with the law. Now, he had lost his wife, his house, and his job. He was the victim. He had been taking prescription pain medicines that had many side effects. The court said they were not there to discuss a defense based on his taking medications unless it related to something his counsel, Rose Cardoso, was not doing.

Cardoso told the court defendant thinks if she would present his story to the court, the court would allow him to go home. Defendant said he did not deserve prison, and he needed legal advice to look at his case. The court reminded defendant they had discussed these points before. It could not release defendant, and his assertions about his medications, on which Cardoso was competent, were not grounds to relieve her. Regarding substitute counsel, the court had already contacted an attorney defendant had requested, and the attorney informed the court he would not be prepared to take this case to trial when it was scheduled. The court noted Cardoso was competent and prepared to go to trial, but it asked if there was some reason it should appoint the other attorney and postpone this case indefinitely. Defendant sought additional review because he did not believe he committed the crime. He again referenced his medications. At that point, the court denied the *Marsden* motion. Cardoso was prepared for trial, and it was time for this case to go to trial.

The court asked defendant whether he was willing to accept the prosecution's pretrial offer of 12 years in state prison on a guilty plea of voluntary manslaughter. When defendant did not respond, Cardoso informed the court she had explained to

11

defendant the likely outcome of the case based on the strength of the evidence, but defendant believed a jury would acquit him. The court counseled defendant that he had been well advised by his attorney. Her assessment was realistic, and the court was not going to replace her. The court again inquired about the offer. Defendant said, "All I can take at this time is guilty of taking prescription medicines."

In this first motion, defendant raised no grounds of incompetence. He attempted to argue the merits of the case, and he simply disagreed with counsel's realistic assessment. This did not show he was receiving ineffective assistance of counsel.

The second *Marsden* motion was also heard before trial. Defendant again did not show counsel was representing him ineffectively. Defendant asserted Cardoso was not representing him well because he had asked her to file a motion to dismiss under section 995 and she did not do so. He also complained Cardoso had not shown him the police report, and she would not see him or listen to him. The trial court stated it had heard the preliminary hearing, and there was substantial evidence to hold defendant for trial.

Cardoso also refuted defendant's charges. She stated she had met with defendant in jail "several times," and had spoken with him on the phone a number of times. Regarding the police report, Cardoso said, "Given the lack of recall in the case, viewing the police reports in the particular way he would like to view, would not be helpful to him." Regarding a motion to dismiss, Cardoso explained she had reviewed the preliminary hearing transcript and did not believe there were grounds to bring the motion.

Defendant said that even at that moment Cardoso was not listening to him. The court, however, disagreed, and it denied his motion. It believed Cardoso was "eminently prepared." She had spent a significant amount of time with him. She was listening to him, but defendant was not listening to her. The court advised defendant to spend more time listening to her, because this was a serious case. The court suggested defendant not spend his energies on a motion to dismiss, but rather direct his attention to the allegations and facts of the case.

12

In this second motion, defendant received an adequate opportunity to address his complaints, and his complaints did not show Cardoso was providing ineffective assistance. Cardoso had visited and spoken with defendant many times and had prepared the case. Because defendant claimed to have no memory of the murder, it was Cardoso's judgment he remain in that state and not view the police report. " 'When a defendant chooses to be represented by professional counsel, that counsel is "captain of the ship" and can make all but a few fundamental decisions for the defendant.' [Citation.]" (*Valdez, supra*, 32 Cal.4th at p. 96.)

Defendant brought his third *Marsden* motion prior to voir dire. He complained Cardoso had not investigated his case properly. He also asked the court to delay the trial because he was not in the right state of mind to go forward. The court asked what counsel had not done. Besides repeating the arguments he had made in earlier motions, defendant asserted Cardoso had not investigated whether there had been '[s]ome kind of breaking and entry." Under the court's questioning, defendant admitted Cardoso had met with him for many hours at the jail, but he asserted she had not discussed the evidence with him. The court asked Cardoso if she had met with defendant for many hours and discussed the case at great length. She said she had. Defendant asked for another attorney who would not force him to trial without a defense. The court stated that attorney was Cardoso, and it denied the motion.

In this third motion, defendant again had a sufficient opportunity to express his complaints, and again failed to show counsel was not representing him effectively. Defendant admitted Cardoso had spent many hours with him, and Cardoso stated she had discussed the evidence with him.

Defendant brought his fourth *Marsden* motion after the jury had returned its verdict of second degree murder. He complained about the jury instructions and that he did not receive a different attorney. The court said it had ruled on both of those matters and was not going to revisit them. Defendant complained Cardoso had not asked

13

questions he had suggested. Cardoso stated she in fact did ask his suggested questions if she thought they would help. Others were not germane to the trial for tactical reasons.

Defendant again claimed Cardoso did not investigate the case and did not let him read any reports. When pressed by the court to explain what else an investigator could have done, defendant said she could have looked "at the other robbery or something that was probably done." Cardoso explained she had discussed this point in her initial interview with defendant. He had wanted to be released so he could go to his home and see if any items had been taken. She told him the court would not allow him to be released. In addition, she had reviewed the police reports and photos, and it did not appear the house had been ransacked or that items usually stolen by thieves had been taken. She had asked defendant what he thought might have been taken, and he said he could not tell unless he visited his home. Cardoso told him that was not possible, and the evidence did not suggest further investigation on this point was necessary.

The court stated defendant had raised nothing new, and none of his comments were "anywhere close to sufficient" to relieve his attorney. The court noted that given the facts, there was not much of an opportunity to present a valid defense, and Cardoso represented him to the best of her ability "based on the very, very difficult and harsh evidence against [him]." The court encouraged defendant in the sanity phase to exercise proper decorum in the courtroom, especially as the expert witnesses testified. The sanity phase was his portion of the trial, and his whole life was at issue. The court explained how the sanity phase would proceed and what to expect from each side, and asked defendant to rely on his competent counsel.

Defendant raised one more point. He was not happy with the verdict and did not believe he killed his wife. The court told him he had a right to appeal, but this was not the time to appeal as there was no final judgment.

For this fourth time, the court gave defendant a full opportunity to express his dissatisfaction, and for a fourth time he failed to show Cardoso had been incompetent or

14

had provided him ineffective assistance.  Counsel's decision not to pursue a defense based on a possible burglary or robbery was within her discretion.  " 'A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense.  [Citation.]  Tactical disagreements between the defendant and his attorney do not by themselves constitute an "irreconcilable conflict." ' [Citation.]"  (*Valdez, supra*, 32 Cal.4th at p. 95.)  This is particularly true here, where there was no evidence to support defendant's theory of a robbery or burglary.

The following day, defendant raised his fifth *Marsden* motion.  He complained that Cardoso had not called Dr. Cavanaugh, the psychiatrist who had opined on defendant's capacity to stand for trial, to testify.  Cardoso explained to him she was not going to call Dr. Cavanaugh because his determination of capacity was different than whether defendant was sane when he committed the offense.  She said she would call him if the need arose as the sanity phase progressed.

The court agreed with Cardoso's reasoning and reminded defendant he had ample evidence on his side for the sanity phase.  Defendant, however, again claimed he was not ready to go forward because Cardoso did not represent him well in the first phase and he wanted to hire his own attorney.  The court stopped the hearing at this point, as it was not going to address issues it had previously addressed a number of times.

Over five attempts, defendant failed to show he had been denied effective representation, or that he would be so denied unless substitute counsel was appointed. None of his motions demonstrated Cardoso failed to provide adequate representation or that his conflicts with her were irreconcilable.  Instead, they demonstrated defendant's frustration with his situation and the case against him.  That Cardoso secured a verdict of second degree murder instead of first degree is a testament to her skills as an advocate. The court did not abuse its discretion in denying each of defendant's *Marsden* motions.

15

III

*Admission of Photos*

Defendant contends the trial court erred when over objection it admitted into evidence photographs of defendant's children wearing bloody clothing and 14 autopsy photographs. He does not contend the admission of any specific photo was error; rather, he claims the sheer number of photographs admitted constituted prejudicial error. We disagree.

"This court is often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative (Evid. Code, § 352). A trial court's decision to admit photographs under Evidence Code section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value. [Citation.] Finally, prosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case. [Citations.]" (*People v. Gurule* (2002) 28 Cal.4th 557, 624.)

To determine whether there was an abuse of discretion, we usually address two factors: "(1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in finding that the probative value of each photograph outweighed its prejudicial effect. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 211-212.) We conclude the photos were relevant and the court did not abuse its discretion by finding them more probative than prejudicial.

16

The photographs of the children and their clothing are not prejudicial. They were relevant to help the jury clearly understand the children's condition when the police officers arrived, as explained by the officers in their testimony. The photos are not gruesome or inflammatory. The children are in a calm state. Defendant's son has a large blood stain on the right leg of his pants, and smaller stains and smears on his feet, pants, and shirt. Defendant's daughter has fewer and smaller stains on her feet, shirt, and pants.

The autopsy photos also are not prejudicial. Of the 14 photos, nine depict bruises and cuts Sherene suffered on her face, inner lip, wrist, hand, and arm, and show her bloody clothing. These are not gruesome and depict the injuries described at trial. One photo depicts a deep laceration between her thumb and forefinger on her left hand. Four of the photos depict the three stab wounds in her neck. One of the photos was taken at the crime scene, and the other three were taken during the autopsy. These last five photos are explicit, but not so much as to cause the jurors to deliberate and decide based solely on a visceral reaction to them. The photos were relevant to show the extent of the injuries. They were not inflammatory or prejudicial. The court did not abuse its discretion in admitting them.

IV

*Denial of Motion to Continue Sentencing*

Defendant contends the trial court abused its discretion when it denied his motion to continue sentencing to allow a new attorney time to prepare a motion for new trial. We disagree.

"A continuance in a criminal trial may only be granted for good cause. (§ 1050, subd. (e).) 'The trial court's denial of a motion for continuance is reviewed for abuse of discretion.' [Citation.] 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial

17

judge at the time the request is denied.' [Citations.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.)

In this case, the jury returned defendant's verdict on March 11, 2011, and on the same day, the trial court scheduled sentencing for Monday, April 18, 2011. On Friday, April 15, at 12:20 p.m., defendant's newly retained counsel and counsel on appeal, John P. Brennan, filed a motion to continue the sentencing hearing. Counsel declared he had been retained by defendant on April 7, 2011, to prepare a motion for new trial if warranted. He stated he wanted to review issues of defendant's competency and sanity, and competency of counsel. He also stated the transcripts of defendant's trial would not be delivered to him until April 18, the day of sentencing. He asked for at least a six-week delay so he could file a motion for new trial after reviewing the transcripts.

Mr. Brennan raised his request again at the start of the sentencing hearing, asking the hearing be continued to June 13, 2011. The trial court denied the motion. The court had presided over defendant's case from the competency and preliminary hearings through trial. It then reviewed all that had happened in the case. It concluded there was no ground for continuing the hearing, as "there was no error by Ms. Cardoso, no underrepresentation or incompetence by her. [Defendant], given his high degree of education and highly responsible job at the San Jose airport, was certainly tuned in after all the trials and involvement of not just [his retained counsel at the competency and preliminary hearings], Ms. Cardoso and the Court, but with all of his rights in the case. That certainly would include the right to testify . . . . [¶] And with all respect to your motion, I'd deny it, because I don't think there's sufficient basis for it at this time."

The trial court did not abuse its discretion denying the request, as defendant failed to establish good cause for the continuance. Defendant sought a continuance to file a new trial motion on matters the court had reviewed and decided numerous times. In effect, the court decided his proposed grounds for a new trial were not viable, and thus a continuance was not necessary for those purposes. As shown above, the evidence

18

supported the trial court's conclusion. The court thus did not abuse its discretion by finding no good cause existed for continuing the sentencing hearing.

V

*Defendant's Right to Testify*

Defendant contends the trial court denied him his right to testify on his own behalf. We disagree. The record indicates he chose not to testify before the court submitted the matter to the jury, and he withdrew a request he made after the case went to the jury.

Defendant testified at his preliminary hearing, over the objection of counsel. The issue of whether he should testify at trial surfaced during the guilt phase. On February 15, 2011, the prosecution rested its case. The court informed the jurors that when they returned on Friday, February 18, it would ask the defense if it has any evidence. If it did, the jury would hear it. After the court excused the jury, it heard evidentiary arguments and admitted the exhibits. Before adjourning for the day, the court told defendant that when court reconvened on Friday, "you will have to have made a decision whether you want to testify or not. [¶] And, again, I'm not going to talk to you about whether that's a good or bad idea or make any recommendations. You and I talked about it last week, and I would just ask you to recollect and ponder the comments that I made then." A few moments later, defendant stated he wanted to object to the evidence. The court said it had handled that issue already; that it goes through counsel, not defendant; and counsel had made objections.

On Friday, February 18, the trial reconvened. It reminded the jury the prosecution had rested in the guilt phase. It then asked defense counsel, "[Y]ou're going to rest at this point, correct?" Defense counsel said, "Yes, Your Honor." The court then proceeded to instruct the jury and to hear counsel's closing arguments. After the court dismissed the jury to begin deliberations, and after it dismissed the alternate jurors, the court began a discussion with counsel about whether they needed to be present when the

19

jury reassembled and when the jury could next meet to continue deliberations. During this discussion, defendant attempted to interrupt, but the court reminded him they really could not talk and he was free to talk with his attorney. Defendant replied: "I wanted to testify, and I was not given the chance to testify today. I didn't --" The transcript indicates defendant and defense counsel conferred after this remark. It then indicates the court continued with its discussion about when the jury could next convene; it did not mention defendant's statement again. Defendant did not speak to the court for the rest of the day.

Defendant contends the trial court denied him his right to testify on his own behalf. It did not. It had previously informed defendant he would have to decide by the next day of trial whether he wanted to testify. When the time came to announce that decision, his attorney stated she was not going to present any evidence. The trial court was entitled to rely upon counsel's statement and its inference that defendant had decided not to testify. " ' "[A] trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy; otherwise, the judge would have to conduct a law seminar prior to every criminal trial." ' [Citation]" (*People v. Alcala* (1992) 4 Cal.4th 742, 805.)

Defendant made his request to the court after the close of testimony and after the case had been submitted to the jury. While that time may not necessarily have been too late to make such a request (see *People v. Alcala, supra*, 4 Cal.4th at pp. 805-806 [request by defendant to testify made after verdict had been rendered was too late]), here, the record suggests the request was ultimately withdrawn. After he made his request, the trial apparently paused as defendant and his attorney counseled together. Following that consultation, trial proceeded and the matter was not raised again. With no evidence suggesting otherwise, we must assume the issue was resolved between defendant and counsel. Otherwise, a statement to the contrary would have been put on the record and

20

the court would have addressed it. With no evidence suggesting that occurred, we assume in support of the judgment that defendant withdrew his request and conclude the trial court did not deny defendant his right to testify.

## VI

### *Lack of Instructions on Manslaughter*

Defendant contends the court erred by not instructing the jury on voluntary and involuntary manslaughter as lesser included offenses of second degree murder. We disagree, as no evidence in the record of the guilt phase justified instructions on either offense.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)

Here, there was no evidence defendant's crime was less than second degree murder, and thus manslaughter instructions were not required. Voluntary manslaughter occurs when a person who kills is deemed to lack malice " 'in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense" -- the unreasonable but good faith belief in having to act in self-defense [citations].' " (*People v. Breverman, supra*, 19 Cal.4th at pp. 153-154.) The record in the guilt phase contains no evidence defendant killed his wife in either of these circumstances. There were suggestions defendant may have killed his wife during a struggle, but there was no

evidence he killed out of a sudden quarrel or heat of passion or unreasonable self-defense.

Involuntary manslaughter occurs when a person kills another without malice "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection . . . ." (§ 192, subd. (b).) The crime happens when a person kills another in the commission of a misdemeanor that is dangerous to human life under the circumstances (*People v. Cox* (2000) 23 Cal.4th 665, 675-676), or when death occurs from the commission of a lawful act in a criminally negligent manner (*People v. Penny* (1955) 44 Cal.2d 861, 879-880). Again, the record in the guilt phase contains no evidence defendant killed his wife under either of these circumstances.

Even if the court erred by not instructing on manslaughter, the error was harmless under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, the standard that applies to error for failing to instruct on a lesser included offense. (*People v. Breverman, supra*, 19 Cal.4th at p. 149.) It is not reasonably probable defendant would have received a more favorable result had the court instructed on manslaughter.

The circumstantial evidence overwhelmingly established defendant killed with malice. Defendant stabbed his wife three times in the neck, moving the knife around inside the body with each deep stab. He cut her trachea and her jugular vein, leading her to bleed to death and drown in her own blood. He inflicted at least nine incisions in her face, neck, and head, and numerous abrasions and contusions on her lips and body. When deputies arrived at the scene, defendant, completely saturated in blood, jumped from a bedroom holding a knife and repeatedly asked the deputies to shoot him. Defendant submitted no evidence in the guilt phase to contradict this bloody display of intent to kill. As a result, it is not reasonably probable he would have received a more favorable verdict had the court instructed on manslaughter. There was no prejudicial error.

22

## VII

### *Cumulative Error*

Defendant contends the accumulation of alleged errors warrants reversal.  We have found no error; consequently, defendant's argument is without merit.  (*People v. Benavides* (2005) 35 Cal.4th 69, 115.)

### DISPOSITION

The judgment is affirmed.


       NICHOLSON     , J.


We concur:


     BLEASE      , Acting P. J.


     DUARTE    , J.